# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 8883 | DATE | 5/27/2004 |
| CASE TITLE | Thompson vs. City of Chicago, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion for summary judgment is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAY 28 2004 date docketed | 84 |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TH✓ | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAY 2 8 2004

LEE THOMPSON, Individually and as Independent )
Administrator of the Estate of JAMES THOMPSON, )
Deceased, and PAULETTE WHITE-THOMPSON, )
)
Plaintiffs, )
)
v. )
)
CITY OF CHICAGO; OFFICER BRADLEY HESPE, )
Star No. 15218, in his Individual and Official Capacities; )  No. 01 C 8883
OFFICER ERIC REYES, Star No. 10126, in his Individual )
and Official Capacities; OFFICER BRENDAN )
DOUGHERTY, Star No. 5329, in his Individual and )
Official Capacities; OFFICER SHAWN RELLINGER, )
Star No. 7193, in his Individual and Official Capacities; )
OFFICER BRIAN CYGNAR, Star No. 11336, in his )
Individual and Official Capacities; OFFICER MICHAEL )
KOZENKO, Star No. 7577, in his Individual and Official )
Capacities; OFFICER ANTHONY BAUMAN, Star No. )
7487, in his Individual and Official Capacities; OFFICER )
MARK GOLOSINSKI, Star No. 5432, in his Individual )
and Official Capacities; OFFICER JOSE CARDO, Star )
No. 11637, in his Individual and Official Capacities; )
OFFICER NICHOLAS SPANOS, Star No. 9467, in his )
Individual and Official Capacities; DETECTIVE )
RAYMOND KAMINSKI, Star No. 20822, in his )
Individual and Official Capacities; and DETECTIVE )
JOHN FITZSIMMONS, Star No. 5446, in his Individual )
and Official Capacities, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Lee and Paulette White-Thompson are the mother and widow of decedent James Thompson, respectively. Lee Thompson is the administrator of James Thompson's estate. Defendants are the City of Chicago and a number of its police officers and detectives. Plaintiffs



filed a seven-count complaint asserting claims under 42 U.S.C. § 1983 and Illinois state law in connection with the death of James Thompson. Defendants move for summary judgment on all counts of Plaintiffs' complaint.[1] For the reasons discussed below, Defendants' motion is granted in part.

## LEGAL STANDARDS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323, 106 S. Ct. 2548, 2552 (1986). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)). A party will successfully oppose summary judgment only if it presents "definite, competent evidence to rebut the motion." *Equal Opportunity Comm'n v. Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000). The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

---

[1] Defendants have also requested that if the Court denies their motion with respect to Plaintiffs' standing to bring a claim under the Fourteenth Amendment, that the Court certify the question to the Seventh Circuit.

## BACKGROUND

### I. Pursuit of James Thompson

James Thompson was an African-American male. In 2000, he was 6'1", weighed 322 pounds, and was 32 years old. (R. 69-1, Def.'s Statement of Facts, Ex. 14 p. 1.) On the evening of December 5, 2000, Officers Cardo and Spanos were patrolling the area north of Garfield Park in Chicago, Illinois. (R. 76-1, Pl.'s Resp. to Def.'s Statement of Facts ¶ 1.) Observing a building which had been the site of several narcotics-related arrests, Cardo and Spanos saw a person run from the building to James Thompson's car, and then back to the building. (*Id.* at ¶¶ 3-4.) Thompson pulled away, and Cardo and Spanos began to follow him. (*Id.* at ¶ 5.) After Thompson failed to stop at a stop sign, Cardo and Spanos initiated a traffic stop, causing Thompson to pull over. (*Id.* at ¶¶ 6-7.) As Cardo and Spanos began to approach Thompson's vehicle on foot, Thompson drove away. (*Id.* at ¶ 8.) In pursuit of Thompson's vehicle, Cardo and Spanos called for assistance from other officers. Officers Kozenko, Reyes, Golosinski, Hespe, Cygnar, Rellinger, Dougherty, and Bauman received the call for assistance and responded. (*Id.* at ¶¶ 14-17.) During the police pursuit, while attempting to turn right onto Kenton Avenue from Maypole Avenue, Thompson's vehicle skidded over the curb and into a viaduct retaining wall. (*Id.* at ¶¶ 28-29.)

### II. Apprehension of James Thompson

After Thompson's car slammed into the retaining wall and officers began to approach the vehicle, Thompson exited the car flailing and swinging his arms at the approaching officers. (*Id.* at ¶ 32.) Thompson struck Officer Reyes in the shoulder, and the police officers considered Thompson an "assailant" because he was attacking them. (*Id.* at ¶¶ 33-34.) Officers Reyes and

3

Dougherty struggled with Thompson, all three falling to the ground as Officers Cygnar, Rellinger, and Hespe reached the struggle. (*Id.* at ¶¶ 35-37.) On the ground, Thompson struggled as the officers attempted to handcuff Thompson's hands behind his back. (*Id.* at ¶¶ 38-39.) Officer Hespe knelt on the ground with his torso in contact with Thompson, and struggled to gain control of Thompson's arms. (*Id.* at ¶ 42.) As Thompson struggled to get up, Officer Hespe was pushing down on Thompson's back to prevent him from raising up off of the ground. (*Id.* at ¶¶ 44-48.) During the struggle, Hespe ended up on top of Thompson's back, where Hespe then moved his right arm over Thompson's shoulder. (*Id.* at ¶ 49.) During the struggle, Officer Hespe placed his arm around Thompson's neck, with his arm making contact with the front portion of Thompson's neck. (*Id.* at ¶ 50.) Although none of the other officers claim to have seen Hespe apply pressure to Thompson's neck, there is an issue of fact as to (1) whether Hespe applied pressure, and (2) what the officers saw.[2] (*Id.* at ¶¶ 62-72.)

Within 15 seconds of Thompson falling to the ground, Officers succeeded in handcuffing him using two sets of handcuffs. (*Id.* at ¶¶ 60, 73.) Thompson continued moving and struggling, and shortly after being handcuffed, said, "I cannot breathe." (*Id.* at ¶¶ 74-75.) In response,

---

[2] Responding to testimony of each officer stating that he did not see a choke hold, Plaintiffs point out that Officer Hespe admitted to placing his arm around Thompson's neck, that medical evidence supports the theory that a choke hold caused Thompson's death, and that the neck pressure must have lasted for at least a minute. With regard to Officers Cygnar, Dougherty, Rellinger, and Reyes, who were also struggling with Thompson, a reasonable jury could conclude that these officers saw Officer Hespe apply pressure to Thompson's neck given their involvement in the struggle. As for officers Bauman, Golosinski, and Kozenko, the deposition testimony of these officers makes clear that they were observing the struggle in some detail. Accordingly, there is a question of fact as to whether they saw Officer Hespe apply pressure to Thompson's neck. Plaintiffs do not contend that Officers Cardo and Spanos, who viewed the struggle from a much greater distance, incurred any duty to prevent Officer Hespe from choking Thompson. The observations of Cardo and Spanos are, therefore, not in contention.

officers rolled Thompson to his side in order to aid his breathing and called for an ambulance. (*Id.* at ¶¶ 76, 79.) Thompson's complaints continued, and officers removed the handcuffs. (*Id.* at ¶ 77.) Seconds after officers removed Thompson's handcuffs, he passed out. (*Id.* at ¶ 78.)

## III. Thompson's Death

Five minutes after being dispatched, an ambulance arrived on the scene. Upon the arrival of the ambulance, Thompson was not moving. (*Id.* at ¶¶ 80-81.) Paramedics examined Thompson, found a large amount of blood in his airway, and at least one paramedic determined that he was dead. (R. 81-1, Def.'s Resp. to Pl.'s Statement of Additional Facts, ¶¶ 35-38.) Police officers had not rendered first aid to Thompson. (*Id.* at ¶ 39.)

## IV. Detective Involvement

After inspecting the scene of Thompson's wreck,[3] police detectives Kaminski and Fitzsimmons went to Mt. Sinai Hospital, where the ambulance had taken Thompson. At the hospital, Detective Kaminski told Paulette White-Thompson, the decedent's wife, that the medical examiner would determine the cause of death. Paulette White-Thompson also testified that one of the detectives told her that Mr. Thompson simply got out of his car after the wreck, clutched his chest, fell face first, and collapsed.[4] (R. 81-1, Def.'s Resp. to Pl.'s Statement of Additional Facts, ¶ 59.) Fitzsimmons returned to the Area 4 detective division offices, where he interviewed all ten police officers who had been at the scene. (R. 76-1, Pl.'s Resp. to Def.'s

---

[3] Neither Fitzsimmons nor Kaminski interviewed any non-officer witnesses at the scene. Defendants contend, and Plaintiffs offer no evidence to the contrary, that there were no such witnesses. (R. 81-1, Def.'s Resp. to Pl.'s Statement of Additional Facts, ¶ 52.)

[4] Defendants do not deny that a detective offered this simplified explanation to Ms. White-Thompson. Rather, they point out that Detective Kaminski told her that the medical examiner would determine the cause of death.

5

Statement of Facts ¶¶ 88, 91.) Kaminski remained at the hospital and returned to Area 4 later to begin gathering the reports of the police officers. (*Id.* at ¶¶ 89, 92.) Kaminski and Fitzsimmons began typing the Case Supplementary Report, but Kaminski went on furlough before detectives finished the report on December 14, 2000. (*Id.* at ¶¶ 94-96.) Kaminski had no further involvement in the investigation. (*Id.* at ¶ 99.)

## V. Autopsy and Medical Examiner's Report

The medical examiner, Dr. Barry Lifshultz, performed an autopsy on Thompson's body on December 6, 2000. Dr. Lifshultz could not determine the cause of death from the autopsy alone, but he reviewed the detectives' report of the incident as well. (R. 76-1, Pl.'s Resp. to Def.'s Statement of Facts ¶ 106.) Based on his examination of the decedent's body and his review of the incident report, Dr. Lifshultz concluded that "James Thompson died as a result of asphyxia due to a choke hold," and that "[h]ypertensive cardiovascular disease and opiate intoxication contributed to death." (R. 69-1, Def.'s Statement of Facts, Ex. 14 p. 5.) Thompson suffered from severe hypertension and heart disease, his heart being three times the size of a normal person of Thompson's height. (R. 76-1, Pl.'s Resp. to Def.'s Statement of Facts ¶¶ 111-112.) Thompson's health problems created the potential for sudden death at any time, particularly with any type of physical stress or exertion. (*Id.* at ¶ 113.)

Dr. Lifshultz's "Report of Postmortem Examination," including his conclusion on the cause of Thompson's death, is dated April 12, 2001 — more than four months after Thompson's death. On November 19, 2001, Plaintiffs filed this lawsuit against the City of Chicago and Detective Kaminski. On April 15, 2002, Plaintiffs filed an amended complaint naming the other officers as Defendants.

## ANALYSIS

### I. Statute of Limitations

Defendants contend that the applicable statute of limitations bars Plaintiffs' state-law claims. Defendants point out that Thompson died on December 5, 2000. While Plaintiffs sued Detective Kaminski and the City of Chicago within the statutory period on November 19, 2001, Defendants argue that Plaintiffs amended their complaint to include the remaining Defendants five months after the statute had run.

The Illinois statute of limitations for all actions brought under state law against a municipality or its employees is one year. 745 ILCS 10/8-101. The statute of limitations begins to run when a plaintiff knows or should have known of the commission of the allegedly illegal act. *Russell v. City of Chicago*, No. 03 C 3788, 2004 WL 868368, *2 (N.D. Ill. April 22, 2004) (citing *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993)).

To prevail at summary judgment on the statute of limitations, Defendants must show that there is no genuine issue with regard to the following facts: (1) when Plaintiffs discovered, or should have discovered, the commission of the allegedly illegal act (in this case, the choke hold leading to Thompson's death and any subsequent conspiracy to cover up the alleged act); and (2) Plaintiffs filed more than a year after that date without justification.

Defendants have not carried the first half of their burden. They have not demonstrated when Plaintiffs discovered that the medical examiner had ruled that Thompson's death resulted from a choke hold. Dr. Lifshultz apparently signed his report on April 12, 2001, but it is unclear when Plaintiffs knew of the report and Dr. Lifshultz's conclusions. For the purposes of the statute of limitations, there is a genuine issue of fact as to when Plaintiffs knew or should have

known of the facts underlying their claim.

Defendants contend that Paulette White-Thompson believed as early as December 5, 2000 that her husband did not die in the manner that the detective had described in the hospital. Defendants support this assertion by pointing to Paulette's testimony about discussions she had with friends and family regarding suspicions that James Thompson's facial wounds were not the result of a car accident alone. Plaintiff's belief that the police story did not reflect the truth does not mean, as a matter of law, that she should have known that an alleged illegal act led to her husband's death. Given the late date of the medical examiner's report, there is an issue of fact with regard to Plaintiffs' knowledge of Thompson's cause of death.

Because of this issue, filing an amended complaint including additional Defendants on April 15, 2002 does not require summary judgment on the statute of limitations. As a consequence, the Court need not address Plaintiffs' assertion that the statute of limitations should be tolled because of fraudulent concealment of the cause of Thompson's death.

II. Lee Thompson's and Paulette White-Thompson's Individual Claims under § 1983

Counts I and IV allege, in part, excessive force claims under the Fourth Amendment on behalf of James Thompson. Defendants do not challenge Plaintiffs' standing to bring those claims insofar as they are brought by the administrator of Thompson's estate on behalf of the estate. Counts I and IV also allege due process and equal protection claims under the Fourteenth Amendment on behalf of Thompson's mother and wife, individually. Defendants argue that Thompson's mother and wife have no standing to bring these claims as individuals.

Even if Thompson's wife and mother had standing to bring an equal protection claim under Section 1983, Plaintiffs have not produced a shred of evidence that would support such a

8

claim. James Thompson was African American, but if Plaintiffs are claiming that the police officers treated Thompson as they did because of his race, Plaintiffs have brought no evidence to prove it. There is no indication that Defendants would have treated a person outside of Thompson's protected class any differently in a similar situation.

Nevertheless, a person does not have to be a member of a protected group to invoke the equal protection clause. *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000)). To state a cause of action under the clause, a plaintiff "must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." *Id.* In this case, Plaintiffs have presented no evidence that any Defendant sought to satisfy a personal motive unrelated to police duties in restraining, apprehending, or otherwise dealing with James Thompson. Plaintiffs cannot, therefore, state a claim under the equal protection clause against any Defendant.[5] The Court need not address the arguments set forth by both parties with regard to standing. Summary judgment is granted with respect to Counts I and IV to the extent they allege claims other than Fourth Amendment claims by James Thompson's estate.[6]

---

[5] Similarly, because Defendants' actions are subject to Fourth Amendment scrutiny, Plaintiffs cannot maintain a due process claim against Defendants. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ("[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach.")

[6] In all of the claims in this suit, Plaintiffs seek relief from each police officer "in his Individual and Official Capacities." A claim against a municipal official in his official capacity is not a suit against the official, but rather a suit against the government entity that employs him. *See Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114

9

### III. Remaining Claims

#### A. Count I: Excessive Force under § 1983 Against Hespe

Plaintiffs' Count I, as altered by the preceding section of this opinion, alleges excessive force in violation of the Fourth Amendment against Hespe. Defendants argue that Hespe did not violate Thompson's constitutional rights and that Hespe is protected by qualified immunity.

#### 1. Violation of Thompson's Fourth Amendment Rights

"[I]n the context of an arrest, [courts] evaluate the officers' use of force according to the reasonableness standard of the Fourth Amendment." *Morfin v. City of East Chicago*, 349 F.3d 989, 1004 (7th Cir. 2003) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)). The objective reasonableness standard applies in deadly force cases as well. *Deering v. Reich*, 183 F. 3d 645, 650 (7th Cir. 1999). Proper application of this test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The reasonableness of an officer's actions is not placed under the scrutiny of hindsight. Rather, courts examine "the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted." *Deering*, 183 F.3d at 650 (internal quotations and citations omitted).

In this case, there is no dispute that the officers were unauthorized to use deadly force in

---

(1985); *Perkins v. Silverstein*, 939 F.2d 463, 469 (7th Cir. 1991). To support an official-capacity claim, a plaintiff must assert facts which show that the defendants acted pursuant to a municipal policy or custom that deprived him or her of a constitutionally protected right. *Id.* Plaintiffs have not alleged such facts for any claim in this suit, and therefore may not sue any Defendant in his official capacity.

10

the apprehension of James Thompson. (R. 81-1, Def.'s Resp. to Pl.'s Statement of Additional Facts, ¶ 15). For the purposes of summary judgment, Defendants have also admitted that the application of a "choke hold" is deadly force. (*Id.* at ¶ 6.) Defendants contend, however, that Officer Hespe placing his arm around Thompson's neck did not represent a "choke hold" and was not deadly force. While Officer Hespe claims not to have applied any pressure to Thompson's neck, he admitted to having placed his right arm around the neck in an attempt to subdue Thompson. Further, the detective's Supplementary Report reflecting officer interviews indicates that Hespe "grabbed" Thompson around the neck. (R. 69-1, Def.'s Statement of Facts, Ex. 19 p. 8.) Examining the body and the police reports, Dr. Lifshultz concluded that a choke hold was the cause of Thompson's death. Despite his denial, a reasonable jury could conclude that Officer Hespe did apply pressure to Thompson's neck. Accordingly, with respect to whether or not Officer Hespe unreasonably used deadly force, there is a genuine issue of fact. Summary judgment is inappropriate on Plaintiffs' Fourth Amendment claim against Officer Hespe.

### 2. Qualified Immunity

The law recognizes that police officers are particularly exposed to constitutional challenges of their actions. Accordingly, the doctrine of qualified immunity protects from legal action officers who have made a reasonable mistake as to what the law requires. To defeat the doctrine of qualified immunity, Plaintiffs must show "a clearly analogous case that established a right to be free from the type of force" that Hespe used against Thompson, or "that the force was so plainly excessive that, as an objective matter, [Officer Hespe] would have been on notice that he was violating the Fourth Amendment." *Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 476 (7th Cir. 1997).

As noted above, there is a genuine issue of fact as to whether Officer Hespe applied a choke hold to Thompson and whether that hold caused Thompson's death. Further, it is undisputed that a choke hold constitutes deadly force and that deadly force was not warranted in this particular case. Accordingly, there is a genuine issue of fact as to whether Hespe would have been on notice that he was violating the Constitution. Defendant may not, therefore, use qualified immunity to achieve summary judgment in this case. Defendants' motion for summary judgment is denied with respect to the remainder of Count I.

### B. Counts II and III: State Law Survival and Wrongful Death Claims

Defendants argue that Counts II and III fail under the Illinois Tort Immunity Act (the "Immunity Act"). Under the Immunity Act, "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. Willful and wanton conduct "does not have to be an intentional act; it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others." *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 973 (N.D. Ill., 1999) (citing *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1081 (7th Cir.1998)) (internal quotations omitted).

It is undisputed that a choke hold constitutes deadly force and that none of the officers were justified in using deadly force to apprehend Thompson on December 5, 2000. There is a genuine issue of fact as to whether Officer Hespe applied a choke hold to Thompson, and whether Officer Hespe's actions caused to Thompson's death. Accordingly, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could conclude that Hespe exhibited a "reckless disregard for the safety of others," and that the situation did not warrant such action.

There is a genuine issue of fact, therefore, as to whether Hespe acted in a willful and wanton manner and whether the Immunity Act applies to protect Hespe in this case. Accordingly, Defendants' motion for summary judgment is denied with respect to Counts II and III.

### C. Count IV: § 1983 Claim Against Other Officers at the Scene

Plaintiffs' Count IV alleges excessive force, due process, and equal protection claims against Defendants Reyes, Rellinger, Dougherty, Cygnar, Kozenko, Bauman, and Golosinski ("On-Scene Officers"). As discussed above, Plaintiffs cannot maintain a due process or equal protection claim based on the facts of this suit. Accordingly, the Court will examine the excessive force claim brought against the On-Scene Officers on behalf of Thompson's estate.

A plaintiff may bring a Section 1983 claim against officers who did not themselves apply excessive force, but failed to intervene on behalf of the victim. "An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original).

Defendants attack the first prong of this test, pointing out that each On-Scene Officer testified that he did not see Officer Hespe apply pressure to Thompson's neck. Plaintiffs argue that the On-Scene Officers were close enough to the struggle that if a choke hold occurred, a reasonable jury could believe that the officers saw it. Viewing the facts in the light most favorable to Plaintiffs, it is reasonable to conclude that the On-Scene Officers saw Officer Hespe

13

using excessive force on Thompson. Officers Dougherty, Cygnar, Rellinger, and Reyes were physically struggling with Thompson. A reasonable jury could find that an officer struggling with a detainee would be aware of a choke hold being applied to the detainee. Officers Bauman, Golosinski, and Kozenko, on the other hand, were some distance away from Thompson, ranging between ten to twenty feet from the struggle. In deposition testimony, however, each of these officers described the struggle in such detail that there is also an issue of fact as to whether they saw Officer Hespe apply pressure to Thompson's neck. Although it is undisputed that officers called an ambulance, released Thompson's handcuffs, and turned him onto his side to aid his breathing, it is for a jury to determine whether they saw and could have prevented Officer Hespe from applying pressure to Thompson's neck. Accordingly, Defendants' motion for summary judgment is denied with respect to the remainder of Count IV.

### D. Counts V and VI: Survival and Wrongful Death Claims Against On-Scene Officers

Counts V and VI allege state-law claims against the On-Scene Officers and the City of Chicago. Count V is a survival claim based on the On-Scene Officers' failure to prevent Officer Hespe from placing Thompson in a choke hold. Count VI is a wrongful death claim against the On-Scene Officers and the City of Chicago. While Count VI does not explicitly state a theory of liability aside from the "wrongful death" caption, it appears that Plaintiffs seek recovery based on the same failure-to-intervene theory of Counts IV and V.

The Illinois Tort Immunity Act prevents tort actions against public employees based on the acts of another person. "Except as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or

omission of another person." 745 Ill. Comp. Stat. 10/2-204. In the Second Amended Complaint, Plaintiffs allege that the On-Scene Officers owed the decedent a "special duty" to prevent Hespe from injuring Thompson.[7] The "special duty" exception to immunity, however, has been severely limited by the Illinois Supreme Court: "Presently, the special duty exception can only apply in cases in which the legislature has *not* explicitly granted immunity to the government and its employees." *Allen v. City of Zion*, No. 01 C 9216, 2003 WL 22078374, *4 (N.D. Ill. 2003) (citing *Harinek v. 161 N. Clark St. Ltd. P'ship*, 181 Ill. 2d 335, 346-47, 230 Ill. Dec. 11, 692 N.E.2d 1177, 1183-84 (1998)) (emphasis in original).

As the Illinois legislature has explicitly granted immunity to public employees with respect to the acts of another person in 745 ILCS 10/2-204, the special duty exception to immunity does not apply to the On-Scene Officers in this case. Accordingly, Defendants' motion for summary judgment is granted with respect to Counts V and VI.

### E. Count VII: Civil Conspiracy Against All Defendants

Count VII[8] alleges a civil conspiracy on the part of all Defendants in covering up the cause of Thompson's death. Defendants move for summary judgment on this claim because Plaintiffs have not asserted a tortious or unlawful act committed in furtherance of the alleged

---

[7] Traditionally, under Illinois law, a plaintiff must prove four elements to invoke the special duty exception: "(1) unique awareness of a particular danger or risk to which the plaintiff was exposed; (2) specific acts or omissions; (3) specific acts that are affirmative or willful in nature; and (4) injury to the plaintiff while under the direct and immediate control of municipal employees or agents." *Moran v. City of Chicago*, 286 Ill. App. 3d 746, 751, 676 N.E.2d 1316, 1320, 222 Ill. Dec.112, 116 (1st Dist. 1997).

[8] Count VII is mislabeled in Plaintiffs' Second Amended Complaint as "Count IV." Interestingly, Plaintiffs' Second Amended Complaint contains over sixty separate paragraphs, but jumbles the numbering so that there are several different paragraphs numbered 27-34, and no paragraph numbered higher than 37.

15

conspiracy. Rather than point out tortious or unlawful acts of the alleged conspirators, Plaintiffs argue that Illinois law does not require an underlying tortious act to support a cause of action for civil conspiracy.

"The elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston,* 209 Ill. 2d 302, 316, 282 Ill. Dec. 837, 807 N.E.2d 461, 470 (2004) (citing *Adcock v. Brakegate, Ltd.,* 164 Ill. 2d 54, 62-63, 206 Ill. Dec. 636, 645 N.E.2d 888 (1994)).

In this case, Plaintiffs have not contended that any act in furtherance of the putative cover-up conspiracy was a tort or that Defendants have acted in combination. Plaintiffs have, however, alleged that Defendants "gave false statements in connection with their official duty, failed to properly investigate Mr. Thompson's death, and made false statements to Plaintiffs' family regarding his death." It is conceivable that such acts could constitute "unlawful acts" to support a conspiracy claim, but Plaintiffs do not specify which laws the alleged acts violate. Furthermore, it is undisputed that Detective Kaminski told the decedent's wife that the medical examiner would determine the cause of death. Even in the light most favorable to Plaintiffs, Kaminski's actions are not "unlawful acts" that support a conspiracy to cover up the cause of Thompson's death. Indeed, considering that detectives and officers contributed to the report that Dr. Lifshultz relied upon in determining the cause of death, the Defendants — rather than conspiring to conceal — were instrumental in bringing to light a possible claim by Plaintiffs.

## CONCLUSION

Defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted on Counts I and IV to the extent that those counts allege violations other than Fourth Amendment claims on behalf of James Thompson's estate. Summary judgment is denied with respect to Counts II and III, and the remainder of Counts I and IV. Summary judgment is granted with respect to Counts V, VI, and VII. The only Plaintiff remaining in the case is Lee Thompson, as administrator of James Thompson's estate. By virtue of the Court's ruling on Count VII, Officers Cardo and Spanos are no longer Defendants in this case.

Dated: May 27, 2004              ENTERED

_____
AMY J. ST. EVE
United States District Court Judge